UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KELLY SEALE and DAVID SEALE,
                                    Plaintiffs,

v.                                                                 5:11-CV-0278
                                                                   (GTS/ATB)

MADISON CNTY.; ALLEN RILEY, Individually
and in his Official Capacity as Madison Cnty.
Sheriff; MATTHEW EPISCOPO, Individually and
in his Official Capacity as Captain of the Madison
Cnty. Sheriff's Ofc.; DOUG BAILEY, Individually
and in his Official Capacity as Former Undersheriff
for Madison Cnty.; and RYAN AYLWARD, Individually
and in his Official Capacity as Coordinator of Labor
Relations for Madison Cnty.,
                                    Defendants.
_____

APPEARANCES:                                        OF COUNSEL:

O'HARA, O'CONNELL & CIOTOLI                STEPHEN CIOTOLI, ESQ.
  Attorneys for Plaintiffs
7207 East Genesee Street
Fayetteville, NY 13066

THE LAW FIRM OF FRANK W. MILLER          CHARLES C. SPAGNOLI, ESQ.
  Attorneys for Defendants               FRANK W. MILLER, ESQ.
6575 Kirkville Road                      BRYAN N. GEORGIADY, ESQ.
East Syracuse, NY 13057

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment discrimination action filed by Kelly Seale

and David Seale ("Plaintiffs") against the above-captioned government entity and four named

individuals ("Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R.

Civ. P. 56. (Dkt. No. 34.) For the reasons set forth below, Defendants' motion for summary

judgment is granted.

## I.  RELEVANT BACKGROUND

### A.  Procedural History

Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite this action's procedural history, including Defendants' motion for judgment on the pleadings, which was granted in part and denied in part.  *See Seale v. Madison Cnty.*, 929 F. Supp. 2d 51 (N.D.N.Y. 2013).

### B.  Plaintiffs' Claims

The following claims survived Defendants' motion for judgment on the pleadings:  (1) a hostile work environment claim by Plaintiff Kelly Seale ("Kelly Seale") against Defendant, Madison County ("the County") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the New York Human Rights Law, N.Y. EXEC. LAW § 296 ("NYHRL"); (2) a hostile work environment claim by Kelly Seale against Defendant, Matthew Episcopo ("Episcopo") pursuant to 42 U.S.C. § 1983 ("Section 1983"); (3) a retaliation claim by Kelly Seale against the County pursuant to Title VII; (4) a retaliation claim by Kelly Seale against the County as well as Defendants, Episcopo, Allen Riley ("Riley") and Ryan Aylward ("Aylward") pursuant to NYHRL; (5) a First Amendment retaliation claim by Kelly Seale against the County, Riley, Episcopo and Aylward; and (6) a First Amendment retaliation claim by Plaintiff, David Seale ("David Seale") against the County, Riley, Episcopo, Aylward and Defendant, Doug Baily ("Bailey").

### C.    Undisputed Material Facts[1]

Unless otherwise followed by citations to the record, the following material facts have been asserted and supported by Defendants in their Local Rule 7.1 Statement of Undisputed Material Facts, and either admitted or denied without a supporting record citation by Plaintiffs in their Local Rule 7.1 Response (*compare* Dkt. No. 34-1 [Defs.' Rule 7.1 Statement] with Dkt. No. 38 [Pls.' Rule 7.1 Response]), or have been asserted and supported by Plaintiffs in their Local Rule 7.1 Statement of Additional Undisputed Material Facts, to which Defendants have failed to respond (*see* Dkt. No. 38 at 70-77 [Pls.' Rule 7.1 Statement]).

Kelly Seale is a former employee of the County. She was employed as the Community Services Aide at the County Sheriff's Office from January 2, 2008 until she resigned effective May 31, 2010. Kelly Seale was a part-time employee and was not entitled to vacation time, sick leave or other compensated leave. Kelly Seale's husband, David Seale, is currently employed by the County in the Sheriff's Office. David Seale began his employment as a Deputy in the Sheriff's Office in 1998. According to Sheriff Riley, David Seale was promoted to Sergeant effective August 9, 2014. (*See* Dkt. No. 41-2 at ¶ 4 [Reply Aff. of Allen Riley, Aug. 22, 2014].)

---

[1]    Defendants ask the Court to strike Plaintiffs' response to Defendants' Statement of Material Facts and to deem Defendants' Statement of Material Facts admitted due to Plaintiffs' pervasive violations of Local Rule 7.1. Moreover, Defendants ask the Court to award them their costs and fees associated with the preparation of their request, including a 41-page appendix detailing all of the improprieties in Plaintiffs' Response. (*See* Dkt. No. 43.) Defendants' request is granted in part and denied in part. To be sure, Plaintiffs' response to Defendants' Statement of Material Facts is replete with violations of Local Rule 7.1. However, rather than strike Plaintiffs' entire response, the Court will deem admitted those Statements of Fact that Plaintiffs deny without record citations, which support their denial or where their purported denial is merely argument unrelated to the Statement of Fact, so long as the Statement of Fact itself is supported by the record. In addition, the Court denies Defendants' request for an award of fees and costs. Finally, Plaintiffs' counsel is strongly cautioned to carefully adhere to this Court's Local Rule 7.1 in the future.

Defendant Riley is the current Sheriff of the County. He was elected to that position in November 2009 and assumed office in January 2010. Defendant Bailey was employed as Undersheriff of the County from 1991 until he retired on December 1, 2010. From September 2009, when former Sheriff Ronald Cary ("Cary") resigned, until Sheriff Riley took office, Bailey performed the duties of Sheriff on an interim basis.

Defendant Aylward is currently employed as the Director of Labor Relations in the County's Personnel and Civil Service Department. He has held that position since Spring, 2010. Prior to Spring, 2010, he was employed as the County's Coordinator of Labor Relations.

Defendant Episcopo was formerly a Captain in the Sheriff's Office. He held that position from 2005 until he retired in May, 2011. According to Sheriff Riley and Undersheriff Bailey, Episcopo did not have the ability to hire, fire, promote, demote, make any decision substantially changing the salary or benefits of, or make any decision substantially reassigning the duties of any other employee of the Sheriff's Office, including Kelly Seale. (Dkt. No. 34-3 at ¶ 4 [Riley Aff., June 25, 2014]; Dkt. No. 34-5 at ¶ 2 [Bailey Aff., July 1, 2014].) Kelly Seale testified that she did not have any information, nor was she told, that Episcopo could have hired, fired, promoted, denied a promotion to, or reassigned her. (Dkt. No. 34-19 at 82:21-84:7 [Kelly Seale Dep., Oct. 30, 2013].) Plaintiff David Seale testified that Episcopo was involved in the firing of several corrections officers and deputy sheriffs throughout the years, meaning that Episcopo made recommendations to the Sheriff and Undersheriff, who usually followed his recommendations, although the Sheriff had the ultimate authority to make that decision. (Dkt. No. 37-3 at 130:11- 131:8 [David Seale Dep., Oct. 31, 2013].) Bailey testified that during his twenty years as Undersheriff, he never saw a recommendation for termination or suspension, but

saw recommendations for additional training.  (Dkt. No. 37-6 at 15:1-24 [Bailey Dep., Apr. 9, 2014].)

At all relevant times, the County had in place a policy proscribing sexual harassment in the workplace and providing a procedure by which employees may report alleged sexual harassment.  (Dkt. No. 34-32 [Ex. S to Spagnoli Aff., July 1, 2014]; Dkt. No. 34-33 [Ex. T to Spagnoli Aff.].)  The County provided regular training and instruction on its sexual harassment policy to its employees, including Episcopo and Kelly Seale.  (Dkt. No. 34-21 [Episcopo Dep., Apr. 7, 2014, 36:20-37:4 that he attended annual training]; Dkt. No. 34-18 [Kelly Seale 50-h Dep., June 24, 2010, 58:7-60:9 that she attended training and was told how to file a complaint].)

Kelly Seale claims that she "was subjected to repeated instances of sexual harassment, intimidation, humiliation, and discrimination by Defendant Episcopo" from "shortly after the beginning of her employment in January 2008 until January 2010."  (Dkt. No. 1 at ¶ 27 [Compl.].)  However, it is undisputed that prior to November 5, 2009, Kelly Seale did not state or report to any employee of the County, including her husband, that she was being sexually harassed by Episcopo.[2]

From January 2, 2008 until November 5, 2009, Kelly Seale worked in an alcove outside the office of Episcopo in the County's Public Safety Building ("PSB").

On May 19, 2008, Episcopo placed a radio on a cabinet outside of his office and turned it on with the volume set at a high level.  He told Kelly Seale it was to ensure that she could not hear conversations inside his office.  He asked her if that was ok, and she did not object.

_____

[2]     Plaintiffs state, without citation to the record for support, that Kelly Seale did not initially report her claim of sexual harassment because she was afraid that she would be the victim of retaliation.

Subsequently, Kelly Seale complained to then Sheriff Cary, after which Episcopo removed the radio, stating to Kelly Seale, "your radio privileges have been revoked."[3]

In September 2008, after David Seale was taken out of work again by his doctor, Episcopo failed to timely turn in Kelly Seale's time sheet record. As a result, Kelly Seale did not receive her paycheck on schedule. According to Kelly Seale, the prior general practice had been that she filled out her time sheets and put them in Episcopo's mail slot, after which he would sign them and pass them on to payroll. (Dkt No. 37-8 [Ex. 8-F to Ciotoli Aff.].)

On October 20, 2008, Episcopo was in his office with his door shut speaking to a deputy, who had apparently returned to work while still using crutches after having been out on worker's compensation. In a loud tone of voice that Kelly Seale could hear, Episcopo stated, "This department is made up of a bunch of fucking cry-babies that can't do their jobs . . . [this deputy] came back early on crutches and others are still milking comp and crying that their arms hurt. If I had my way, a lot of people wouldn't have their fucking jobs and we all know who I am talking about." At that time, David Seale was out on worker's compensation for a shoulder injury. (Dkt No. 37-8 [Ex. 8-G to Ciotoli Aff.].)

On December 10, 2008, Kelly Seale discovered a pornographic snowman cartoon, lying face down on her desktop keyboard. The cartoon depicted three snowmen masturbating while they stare at a large breasted snow woman. Kelly Seale was sick and upset and went home early because she thought someone was making fun of her. She thought Episcopo left the cartoon

---

[3] According to Plaintiffs' response to Defendants' Statement of Material Fact, Paragraph 19, this "was the first act of harassment by Captain Episcopo." (Dkt. No. 38 at ¶ 19 [Pls.' Response to Defs.' Statement of Material Facts].) This incident is also the first that Kelly Seale recorded on a Madison County Workplace Violence Incident Report form, which she did not share with anyone until after November 5, 2009. (Dkt. No. 37-8 [Exs. 8E-8L to Ciotoli Aff.].)

because she always catches him staring at her breasts when he's around her. Kelly Seale was afraid to tell anyone about the cartoon because she thought no one would believe her word over Episcopo's. (Dkt No. 37-8 [Ex. 8-H to Ciotoli Aff.].) David Seale testified that at some point between 2001 and 2005, the snowman cartoon was posted on a bulletin board when he worked in investigations. It was the same cartoon that Episcopo had previously sent to David Seale and others in an email, but David Seale agreed that he does not have any information that Episcopo is the one who posted the cartoon on the bulletin board. (Dkt. No. 37-3 at 51:4-54:5 [David Seale Dep., Oct. 31, 2013].) At her deposition, Kelly Seale agreed that anyone who was in the PSB around the point in time that she discovered the snowman cartoon on her desk could have left it there and that she has no firsthand knowledge that it was Episcopo who did so. (Dkt. No. 37-17 at 73:1-8 [Kelly Seale 50-H Dep., June 24, 2010].)

On July 13, 2009, the day after Kelly Seale returned from a week's vacation, Episcopo entered his office with a deputy after first seeing Kelly Seale, and began singing in a loud voice, "The bitch is back, the bitch is back, spread her legs and eat her for a snack." Episcopo and the deputy then began saying, in a loud manner, "Red rocket. Red rocket."[4]

On September 24, 2009, James Zophy ("Zophy") announced his intention to run for the

---

[4]       Apparently, according to Plaintiffs' Complaint, the reference to "Red rocket" has to do with an episode of the animated television show, *South Park*, when one of the characters masturbates a dog in order to "milk it." (Dkt. No. 1 [Compl.].) In fact, the Complaint includes the allegation that, during the same exchange Kelly Seale overheard on July 13, 2009, Episcopo and the deputy were talking about the episode, including the aforementioned description of the origin of "Red rocket." *Id.*, ¶ 30(e). Plaintiffs' Statement of Material Fact, Paragraph 110, includes the same allegation as in the Complaint, but presented as fact, citing Kelly Seale's deposition testimony, wherein she admits that "They said 'Red rocket' and that's all." (Dkt. No. 38 at ¶ 110 [Pls.' Statement of Material Facts]; Dkt. No. 37-17 at 79:17-81:16 [Kelly Seale's 50-h Dep., June 24, 2010].) Plaintiffs also include this inaccurate representation of fact in their opposition memorandum of law. (Dkt. No. 38-1 at 6, 9 [Pls.' Mem. of Law].)

office of County Sheriff in the 2009 election. At some point thereafter, David Seale placed a sign supporting Zophy's candidacy on the lawn of his home. Prior to that time, David Seale had not expressed his support for Zophy's candidacy. Kelly Seale was neutral with respect to Zophy's candidacy and did not personally express support for Zophy in his bid for County Sheriff.

On November 3, 2009, Riley won the election for Sheriff against Zophy.

On the day before the election, Episcopo went out of his way to talk to other employees and inform them that they should help themselves to snacks in the break room, but did not extend the same invitation to Kelly Seale. (Dkt. No. 37-8 [Ex. 8-J to Ciotoli Aff.].)

On the day after the election, Episcopo was in his office speaking loudly about Zophy to a lieutenant. Episcopo stated that he was so happy "that fucking cock sucking Zophy didn't get elected" and "I know I'm saying this loud enough so that whoever is sitting outside my door listening knows that changes are coming and they won't like it." Episcopo further stated that he was going to get rid of "those Zophy supporters one by one." (Dkt No. 37-8 [Ex. 8-K to Ciotoli Aff.].) Thereafter, Kelly Seale told Kathy Chaires, the confidential secretary to the Sheriff, about Episcopo's comments. Kelly Seale did not tell Ms. Chaires anything about sexual harassment. That same day, after Kelly Seale was no longer at work, Ms. Chaires relayed to Bailey Kelly Seales' allegations regarding the comments made by Episcopo.

On November 5, 2009, Bailey spoke to Episcopo about what had been reported the previous day. Episcopo testified that he believed Bailey further told him to stay away from Kelly Seale. (Dkt No. 34-21 at 94:3-9 [Episcopo Dep., Apr. 7, 2014].) Bailey denies telling Episcopo to stay away from Kelly Seale, but rather, he informed Episcopo that Kelly Seale was

upset by the comments and that it did not matter which candidate won the election.  (Dkt. No. 34-22 at 45:24-46:15 [Bailey Dep., Apr. 9, 2014].)  Shortly after Bailey spoke to Episcopo, Episcopo returned to his office, followed by Ms. Chaires.  As he entered his office, Episcopo stated, "it's a glorious morning, it's such a nice day, you can't wipe the smile off my face!" and then, as Ms. Chaires was leaving his office, he said "I love it!" over and over again.  (Dkt No. 37-8 [Ex. 8-L to Ciotoli Aff.].)

At some time later in the day on November 5 or on November 6, 2009, Kelly Seale became aware that Ms. Chaires informed Bailey of her complaint about Episcopo.  Bailey requested that Kelly Seale speak to him regarding her concerns, which she did.  During that conversation, Kelly Seale reported for the first time that Episcopo was sexually harassing her.  When Bailey realized that Kelly Seale was claiming sexual harassment, he informed her that the matter would be referred to the County's Personnel Department.  After speaking with Kelly Seale, Bailey notified the County's Personnel Department of her complaint of sexual harassment.  A few days later, representatives of the Personnel Department interviewed Kelly Seale to obtain her complaint.

At the County's request, its outside counsel engaged Public Sector Human Resource Consultants ("PSHRC"), an independent consulting firm, to conduct an impartial investigation into Kelly Seale's claims of sexual harassment.  PSHRC consultant Nanette Hatch conducted the investigation.  She had never spoken to Episcopo prior to the investigation.  She interviewed Episcopo, Kelly Seale, David Seale, Ms. Chaires, and other employees. Ms. Hatch chose who to interview based on her own judgment, expertise, and evaluation of the evidence and witnesses.  Ms. Hatch rendered a report that expressed her conclusion that there was no unlawful hostile environment created by Episcopo.

After the investigation was completed, Episcopo was removed from Kelly Seale's chain of command. Also, at some point after Kelly Seale's complaint was made and the investigation completed, some of Kelly Seale's duties having to do with the website were taken away from her. Episcopo did not take those duties from her.

Beginning November 5, 2009 until approximately January 11, 2010, Kelly Seale worked from home. On January 7, 2010, Aylward advised Kelly Seale that her complaint was unsubstantiated, but that to improve the work environment she would be allowed to report directly to Sheriff Riley rather and Episcopo and her work location would be changed.

Effective approximately January 11, 2010, Kelly Seale's assigned work location was changed from outside Episcopo's office to an office in the County Office Building ("COB"). Kelly Seale worked in that location until she resigned on May 31, 2010. During this time, Kelly Seale's time records reflect that on several occasions she worked before and after normal work hours and on weekends. Kelly Seale did not have access to the COB on nights and weekends because she was not allowed to have a key to the building. (Dkt. No. 37-5 at 49:21-50:17, 51:3-52:25 [Dep. of Allen Riley, Apr. 10, 2014].) David Seale testified to one instance when Kelly Seale was unable to get into the COB after hours to obtain her laptop and other materials and it created a problem for her. (Dkt. No. 34-20 at 178 (David Seale Dep., Oct. 31, 2013].) Kelly Seale testified that she was able to perform her job duties from home but that "it was harder." (Dkt. No. 34-19 at 90:6-8 [Kelly Seale Dep., Pct. 30, 2013].) Both Riley and Bailey were not aware that Kelly Seale contended she needed access to her work location during non-work hours.

Riley made the decision to change Kelly Seale's work location following the recommendation of Aylward, in order to allow her to avoid contact with Episcopo. At the time

10

Riley made this decision, he had no information that Kelly Seale had made allegations that Episcopo made comments directed against her and David Seale on the premise that they were supporters of Zophy's candidacy.  Aylward's sole involvement in the change of Kelly Seale's work location was to recommend that her work location be changed to avoid friction between her and Episcopo; to obtain information regarding other potential work locations; and to inform Riley that there was work space available in the County Office Building.

Riley advised Bailey of the locations he reviewed as potential work locations for Kelly Seale and Bailey advised Riley of the unavailability of at least one potential location, but Bailey had no other involvement in the change of Kelly Seale's work location, and he was not involved in the actual decision to change her work location.  Moreover, Episcopo had no involvement in the change in Kelly Seale's work location.

The space in the COB was selected after a search indicated other possible locations were unavailable for various reasons, including space in the Department of Social Services building and the Public Health building.  Riley testified that there was a photo room in the PSB, although it was "filled with all kind of stuff" at the time, but has since been converted into an office. (Dkt. No. 34-24 at 57:9-23 [Riley Dep., Apr. 10, 2014].)  Kelly Seale testified that she had previously asked Sheriff Cary for the photo room to be her office since it was just a storage closet at the time, and that after her move to the COB, the photo room was made into an office for the SWAT team, although she does not know when the preparations for that office began. (Dkt. No. 37-2 at 90:12-21, 94:21-96:4 [Kelly Seale Dep., Oct. 30, 2013].)  Kelly Seale also testified that she asked Riley to be moved into the Department of Social Services building and that she told him several times she did not want to move to the COB.  (*Id.*, at 96:10-100:24.)

The COB was located in the same complex as the PSB where Kelly Seale previously worked, and is about two to three hundred yards from Kelly Seale's home. Other employees of the Sheriff's Office worked in the COB, although not on the basement floor where Kelly Seale's office was located.

Prior to May, 2010, Kelly Seale was assigned for her use a Chevy Tahoe owned by the County, which bore side markings identifying it as an official police vehicle. Beginning May, 2010, Kelly Seale was assigned for her use instead a green van owned by the County, which did not bear side markings identifying it as a police vehicle. Riley made the decision to change the vehicle assigned to Kelly Seale because he was concerned that a civilian employee should not be driving a marked police vehicle. While he discussed his concerns, with Bailey, Riley made the decision to change Kelly Seale's vehicle assignment. Episcopo's sole involvement in the change of Kelly Seale's vehicle assignment was to identify, at Riley's command, other vehicles in the Sheriff's Office fleet that were unmarked and would permit Kelly Seale to perform her duties. Episcopo notified Riley that the green van was the only unmarked vehicle in the Sheriff's Office fleet at that time that would permit Kelly Seale to perform her duties. Bailey and Aylward had no involvement in changing Kelly Seale's vehicle assignment.

Deputy Jay Pokorny used the green van for evidence transport before, during, and after the period in which Kelly Seale used it. He did not experience any mechanical problems with the van or find it to be dirty or to smell bad. (Dkt. No. 34-9 at ¶ 6 [Aff. of Jay Pokorny, June 19, 2014].) Neither Riley or Bailey had any information that the green van had any mechanical problems. Kelly Seale testified that the one time she used the green van, she experienced problems with the brakes where she had to keep pumping them. (Dkt. No. 37-2 at 89:6-20

[Kelly Seale Dep., Oct. 30, 2013].) In her response to Defendants' interrogatory asking for a description of any and all mechanical breakdowns of the green van that occurred during the time it was assigned to her, Kelly Seale stated "there would be motor pool and maintenance records regarding its history and breakdowns in Defendants' possession, which would have included prior problems with brakes, transmission, engine, battery and it would shake (*sic*). When Kelly Seale used this vehicle it was dirty, unclean, it smelled and it was rusty." (Dkt. No. 37-9 at ¶ 10 and Dkt. No. 37-16 at ¶ 3 [Pls.' Resp. to First Set of Interrogs. for Aylward].)

Since Kelly Seale's work station was relocated, she saw Episcopo on less than five occasions, at which times he did not say or do anything to her that was unprofessional. (Dkt. No. 34-18 at 128:10-18 [Kelly Seale 50-H Dep., June 24, 2010].)

Other than being required to attend the County's regular sexual harassment training, Episcopo was not disciplined or punished as a result of Kelly Seale's allegations against him.

In or about early November 2009, after Kelly Seale filed her complaint against Episcopo, David Seale requested to exercise the "vacation buyback" option provided by the collective bargaining agreement covering his position. At that time, David Seale had been out on leave since March 29, 2009 and was receiving his full salary according to the provisions of New York General Municipal Law § 207-c ("Section 207-c").

Prior to receiving David Seale's request, Bailey had not previously been involved in any Section 207-c vacation buyback issues. Bailey discussed David Seale's request with Aylward. Bailey and Aylward determined that under the collective bargaining agreement, David Seale was not eligible to exercise the vacation buyback option because he had been absent on leave receiving benefits pursuant to Section 207-c for more than three months. Bailey notified David

Seale that his request was denied because his extended leave rendered him ineligible to exercise the vacation buyback option, and that to exercise the vacation buyback option, he would need to return to active duty. According to David Seale, he had exercised his vacation buyback option without issue when he was out of work in the previous year. (Dkt. No. 34-20 at 75:10-4-17 [David Seale Dep., Oct. 31, 2013].) Aylward confirmed that the first time he was asked to check on the appropriateness of David Seale's request for vacation buyback was after Kelly Seale had filed her complaint against Episcopo, although he clarified that the request was denied because David Seale was on 207-c leave at the time and not because of Kelly Seale's complaint against Episcopo. (Dkt. No. 37-7 at 69:13-70:8 [Dep. of Ryan D. Aylward, Apr. 9, 2014].)

David Seale returned to active duty on December 21, 2009. Thereafter, he successfully exercised his vacation buyback option for 2009. Episcopo and Riley had no involvement in the temporary denial of David Seale's request to exercise the vacation buyback option.

David Seale took worker's compensation again beginning in March or April, 2010. On April 19, 2010, Riley sent a letter to David Seale instructing him that while he remained on worker's compensation leave receiving his salary under Section 207-c, he must communicate to his supervisor when he planned to leave his residence during work hours. David Seale was the only County employee ever to receive such an order.

Prior to his election as Sheriff, Riley was a New York State Trooper. He observed that when a New York State Trooper was on sick leave, the officer was required to account to his or her supervisors for his or her whereabouts during work hours, and to communicate to them when he or she planned to leave his or her residence during work hours. Riley also obtained an opinion from Town of Greenburgh Police Chief John Kapica, which analyzed issues relating to

Section 207-c leave and concluded that the heads of police departments could require employees on leave receiving Section 207-c benefits to account for their whereabouts during scheduled work shift hours.

Riley discussed the issue with Aylward before sending the April 19, 2010 letter. (Dkt. No. 37-8, Ex. 8-S to Ciotoli Aff. [April 8, 2010 email from Aylward to Riley stating "The letter looks good to me" and cautioning that Kapica's summary of benefits under Section 207-c "is not a legal opinion" and that "we need to be prepared for a few bumps down the road. If you are ok with this, then I think that you should proceed with the letter."].) However, Episcopo and Bailey had no involvement in Riley's decision to issue the April 19, 2010 letter.

After a union attorney objected, Aylward advised Riley to rescind the April 19, 2010 letter to avoid even the appearance that the County was retaliating against David Seale. On May 6, 2010, Riley sent a letter to David Seale rescinding the instructions in his April 19, 2010 letter. During the seventeen days that the instructions in the April 19, 2010 were in effect, David Seale was never denied a request to leave his home.

On April 29, 2010, David Seale requested to switch shifts with another officer. At the time of the request, David Seale was still on Section 207-c leave and was anticipated to return to active duty in May, 2010. Riley denied the request because he was concerned that such rescheduling matters were subject to bidding and posting under the applicable collective bargaining agreement. Episcopo and Bailey had no involvement in Riley's decision to deny David Seale's request to switch shifts. Aylward testified that he does not recall whether he was involved in that decision. On May 11,2010, at Aylward's suggestion, in order to avoid even the appearance of retaliation, Riley rescinded the denial and approved David Seale's request to

change shifts.  When David Seale returned to active duty in May 2010, he immediately started the transition to the shift he had requested.

According to David Seale, when he returned to work prior to December 28, 2009 in order to obtain his vacation buyback, the County worker's compensation insurer, Public Employers Risk Management Association ("PERMA"), denied his request for reimbursement for further physical therapy.  The denial of physical therapy was by PERMA, the County's third-party worker's compensation administrator.  Riley, Bailey, Episcopo and Aylward each averred or testified that they had no involvement in the denial of David Seale's request for physical therapy reimbursement through PERMA.  However, David Seale contends, through his response to Defendants' interrogatories, that whenever an issue came up in the past regarding authorization of payment for his physical therapy, Sheriff Cary would take care of it.  But when Riley took over, these issues with the denial payment for physical therapy would not be taken care of.  (Dkt. No. 37-14 at ¶ 2 [Pls.' Response to Defs.' Interrogs].)

On July 14, 2008, David Seale claimed that the patrol car he used had been vandalized by someone who had slashed his tire.  The alleged vandalism was investigated on or about July 14, 2008.  The report concluded that a nail had gone up through the tread of the tire and damaged the sidewall of the tire.  The incident was found to be accidental, not vandalism.  David Seale alleges that he found the patrol car he customarily used "vandalized" in miscellaneous ways when he returned to active duty in May 2010.  David Seale testified that he has no information that Riley, Bailey, or Aylward were involved.  According to David Seale's response to Defendants' interrogatories, he "does not know who performed these acts of vandalism, but right after Kelly Seale made her complaint against Episcopo, these acts of vandalism started to occur to his patrol

car, where before, there had never been any such acts of vandalism[.]" (Dkt. No. 37-13 at ¶ 5 [Pls.' Response to Defs.' Interrogs.].)  Episcopo avers that he was not involved in any such "vandalism" of David Seale's patrol car.

David Seale testified that in 2008, Episcopo directed a sergeant to write him up for his use of sick time in conjunction with his pass days.  As a result, David Seale received a written counseling and was directed to obtain a doctor's note when he wished to use sick leave for a period of one year.  (Dkt. No. 34-20 at 69:1-70:4 [David Seale Dep., Oct. 31, 2013].)

In January 2014, David Seale submitted a bid for a sergeant position, but he was not invited to interview for that position.  Thereafter, the position was offered to and accepted by another deputy, Julie Netzband.  Riley testified that he had previously interviewed Deputy Netzband and that she was his first choice for the sergeant position.  According to Riley's testimony, New York Civil Service law permits him to choose anyone of the top three candidates.  (Dkt. No. 37-5 at 90:1-8 [Riley Dep., Apr. 10, 2014].)

### D.     Parties' Briefing on Defendants' Motion

#### 1.     Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert the following six arguments: (1) Kelly Seale's Title VII hostile work environment claim fails because she cannot show that the County was negligent; (2) Kelly Seale's Title VII and NYHRL claims fail because the County has established the elements of the *Faragher/Ellerth* affirmative defense; (3) Kelly's Seale's NYHRL hostile work environment claim fails because she cannot show that the County condoned or acquiesced in the alleged harassment; (4) Kelly Seale's Section 1983 hostile work environment claim fails because she cannot show that Episcopo acted

under color of law; (5) Kelly Seale's First Amendment retaliation claim fails because (a) she admitted that she did not express support for Mr. Zophy, (b) she cannot show that the actions taken were sufficiently adverse to be actionable, and (c) there were legitimate reasons for the change in her work location and vehicle, which she cannot show were pretextual; and (6) David Seale's First Amendment retaliation claim fails because he cannot show that any of the actions taken were actionable. (*See generally* Dkt. No. 34-12 [Defs.' Mem. of Law].)

### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in response to Defendants' motion, Plaintiffs assert the following three arguments: (1) Kelly Seale has stated a proper hostile work environment claim under Title VII and the NYHRL because (a) all of the elements of a hostile work environment claim are satisfied, (b) Episcopo was Kelly Seale's supervisor and the *Faragher/Ellerth* defense does not bar her action, (c) the County condoned and acquiesced in the discriminatory and harassing conduct, (d) Episcopo can also be held individually liable for his discriminatory actions under the NYHRL, and (e) Kelly Seale has stated a proper Section 1983 claim against Episcopo, who was acting under color of state law; (2) Kelly Seale has properly stated a Title VII retaliation claim because (a) she participated in a protected activity, (b) Defendants took tangible adverse employment action against her, (c) the timing between the protected activity and retaliatory actions is enough to create an arguable causal link, and (d) she has presented evidence proving the existence of pretext; and (3) David Seale has properly stated a First Amendment retaliation claim because (a) he engaged in the type of speech protected by the First Amendment, (b) Defendants took adverse employment actions against him, and (c) his speech was a motivating factor for Defendants' retaliatory actions. (*See generally* Dkt. No. 38-1 [Pls.' Opp'n Mem. of Law.)

### 3. Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiffs' response, Defendants assert the following five arguments: (1) Episcopo was not a supervisor and Kelly Seale's hostile work environment claims fail; (2) Kelly Seale's NYHRL claim fails because she cannot show condonation; (3) Episcopo did not act under color of law; (4) Kelly Seale's retaliation claims fail; and (5) David Seale's retaliation claim fails. (*See generally* Dkt. No. 41 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine

issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).  *See also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment).  As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*.

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal

arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[5]  Stated another

way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's

burden with regard to that argument is lightened, such that, in order to succeed on that argument,

the movant need only show that the argument possess facial merit, which has appropriately been

characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed

motion is unopposed and the Court determined that the moving party has met its burden to

demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279,

2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-

Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009)

(Suddaby, J.) (collecting cases).

     **B.**     **Legal Standards Governing Plaintiff's Claims**

     **1.**     **Hostile Work Environment**

     Title VII prohibits an employer from "discriminat[ing] against any individual with

respect to his [or her] compensation, terms, conditions, or privileges of employment, because

of," *inter alia*, "such individual's race, color, religion, sex, or national origin." 42 U.S.C. §

2000e–2(a)(1).  In enacting Title VII, Congress intended to protect against "the entire spectrum

of disparate treatment of men and women in employment, which includes requiring people to

---

     [5]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31
(N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to
oppose several arguments by defendants in their motion for summary judgment as consent by
plaintiff to the granting of summary judgment for defendants with regard to the claims that the
arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-
0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's
failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a
concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole*, 678 F.3d 166, 174-175 (2d Cir. 2012) (citing *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S. Ct. 367 (1993)).

In order to establish a claim for a hostile work environment under Title VII, a plaintiff must prove that the underlying harassment is "sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd*, 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399 (1986); *Harris*, 510 U.S. at 21-22, 114 S. Ct. 367).[6] Further, the plaintiff must prove that the hostile or abusive treatment was because of his or her membership in a class of persons protected by Title VII. *See Redd*, 678 F.3d at 175. The types of workplace conduct that may be actionable on a claim for hostile work environment based on sex "include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor*, 477 U.S. at 65, 106 S. Ct. 2399 (citing 29 C.F.R. § 1604.11(a) (1985)).

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

---

[6] "Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 264 n.1 (2d Cir. 2001) (citing *Tomka v. Seiler Corp*., 66 F.3d 1295, 1304 n.4 (2d Cir.1995), *abrogated on other grounds by*, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S. Ct. 2257 (1998)). *See also Salmon v. Our Lady of Victory Hosp*., 514 F.3d 217, 226 n.2 (2d Cir. 2008). Accordingly, a court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold v Baccarat, Inc.*, 174 F.3d 264  n.1 (2d Cir. 199).

whether it unreasonably interferes with an employee's work performance." *Redd*, 678 F.3d at 175 (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

Moreover, in order to establish her claim for hostile work environment, a plaintiff need not show that her "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd*, 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd*, 678 F.3d at 175-176 (citing, inter alia, *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd*, 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771, 96 S. Ct. 1251 (1976); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ.*, No. 11-CV-3582, 2012 WL 3150388, at *8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio*, 46 F. Supp. 2d 206, 213-14 (E.D.N.Y. 1999)).

In addition to establishing that she was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to her employer. *See Shiner v. State Univ. of New York*, No. 11-CV-1024, 2012 WL 5398658, at *4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold*, 239 F.3d at 245). An employer's liability for such conduct depends on whether the harasser is a coworker or supervisor. *See Vance v. Ball State Univ.*, — U.S. —, —, 133 S. Ct. 2434, 2439 (2013).

The actions of a plaintiff's coworkers will be imputed to the employer only if the employer was negligent. *See Vance*, — U.S. at —, 133 S. Ct. at 2439. In other words, where the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it[,]" the harasser's conduct will be imputed to it. *Wiercinski v. Mangia 57, Inc.*, No. 09-CV-4413, 2012 WL 2319142, at *10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)).

However, an employer is strictly liable for the actions of a plaintiff's supervisor[7] "unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner*, 2012 WL 5398658, at *4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275 (1998);

---

[7]     The Supreme Court has recently held that an employee is a supervisor for purposes of vicarious liability under Title VII if he or she is empowered by the employer "to take tangible employment actions against the victim,  i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 133 S. Ct. at 2439, 2443 (quotation and citation omitted).

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998). Where an employer "maintains a policy against sexual harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York*, No. 11-CV-4958, 2012 WL 4833368, at *3 (S.D.N.Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner*, 2012 WL 4833368, at *3 (citing *Leopold*, 239 F.3d at 246).

### 2. Retaliation - Title VII

To establish a claim of retaliation under Title VII, a plaintiff must prove "(1) participation in a protected activity; (2) the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Bir v. Pfizer, Inc.*, 510 F. App'x 29, 33 (2d Cir. 2013) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted)).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection").[8] Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). A plaintiff "need not establish that

---

[8] Superseded by regulation on other grounds as noted in *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 416 (S.D.N.Y. 2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner*, 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996).

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68, 126 S. Ct. at 2415. "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Similarly, being laid off constitutes adverse employment action. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Walker v. City of New York*, 98-CV-2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997 [was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 343 (S.D.N.Y. 2009) (citing *Knight v. City of New York*, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made

invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.'" *Id.* (quoting *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 542 (E.D.N.Y. 2003)).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII and the NYHRL are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973). *See Guzman v. News Corp.*, No. 09-CV-9323, 2013 WL 5807058, at *19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir.2010); *Lennert-Gonzalez v. Delta Airlines, Inc.*, No. 11-CV-1459, 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead*, 545 F. App'x 23 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of *McDonnell-Douglas* burden-shifting framework).

"Under *McDonnell Douglas*, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield*, 663 F. Supp. 2d at 343.

> If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation

claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir.2006).

*Guzman*, 2013 WL 5807058, at \*19. *See also Puglisi*, 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at \*11 (E.D.N.Y. Sept. 11, 2013); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 408 (S.D.N.Y. 2013).

### 3.  First Amendment Retaliation - 42 U.S.C. § 1983

In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must prove "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689 (1979)).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York*, 821 F. Supp. 2d 651, 655-656 (S.D.N.Y. 2011) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may prove the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a

policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler*, 821 F. Supp. 2d at 655-56 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *Wright*, 21 F.3d at 501).

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 205 (E.D.N.Y. 2013) (quoting *Garcetti v. Cebal los*, 547 U.S. 410, 417, 126 S. Ct. 1951 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must prove that (1) she engaged in "constitutionally protected speech" because she spoke as a citizen on a matter of public concern; (2) she suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon*, 917 F. Supp. 2d at 204 (quoting *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.'" *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684 (1983)). The support of a candidate for public office can reasonably be considered a matter of public concern. *See Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 294 (E.D.N.Y. 2009) (citing *Connick*, 461 U.S. at 149, 103 S. Ct. 1684 (holding that plaintiff's speech about whether government employees were pressured to participate in political campaign touched on a matter of public concern)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik*, 464 F.3d at 226 (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (*abrogated on other grounds by*, *White*, 548 U.S. at 67)).

Regarding the third element of a retaliation claim under the First Amendment, a plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action. *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir.2004) (internal citation omitted). Since a direct showing requires plaintiff to provide "tangible proof" of retaliatory animus, "conclusory assertions of retaliatory motive" are insufficient. *Id.*

Once a plaintiff establishes a prima facie case of First Amendment retaliation, a government defendant may still prevail on a motion for summary judgment where it can establish "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Smith v. County of Suffolk*, — F.3d —, —, 2015 WL 161701, at *3 (2d Cir. 2015) (citing *Morris*, 196 F.3d at 110 (2d Cir.1999) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568 (1977), *abrogated on other grounds by*, *White*, 548 U.S. at 67, 126 S. Ct. 2405)).

III.    ANALYSIS

    A.    **Kelly Seale's Hostile Work Environment Claims**

After carefully considering the matter, the Court grants Defendants' motion for summary

judgment on Kelly Seale's hostile work environment claims against the County and Episcopo for

the following reasons.

First, Defendants have met their burden to show the absence of a material issue of fact

regarding Kelly Seale's Title VII hostile work environment claims against the County.  As

indicated in Part II.B.1. of this Decision and Order, where the alleged harasser is a co-worker, an

employer will be liable on a hostile work environment claim where it was negligent, i.e., where it

either provided no reasonable avenue for complaint or knew of the harassment but did nothing

about it.  On the other hand, where the alleged harasser is a supervisor, the employer is strictly

liable unless it can show that is exercised reasonable care to prevent and correct the harassment

and that the plaintiff acted unreasonably in failing to take advantage of preventive or corrective

opportunities provided by the employer.  Here, it is clear that Episcopo is not a supervisor for

purposes of imputing liability to the County on Kelly Seale's hostile work environment claim.

Moreover, even if he were a supervisor, the County has established its affirmative defense to

Kelly's Seale's claim.  Finally, having concluded that Episcopo was Kelly Seale's co-worker, the

County cannot be deemed negligent based on the uncontroverted evidence that no one at the

County knew of the harassment until after the fact and, once learning of Kelly Seale's complaint,

immediately took steps to prevent any further harassment.

The Supreme Court defines a "supervisor" for purposes of an employer's vicarious

liability under Title VII as an employee who is empowered by the employer "to take tangible

employment actions against the victim, i.e., to effect a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 133 S. Ct. at 2439, 2443 (quotation and citation omitted). Defendants have identified undisputed record evidence that Episcopo did not have the ability to effect a significant change in Kelly Seale's employment status. For example, both Riley and Bailey testified that Episcopo did not have the ability to hire, fire, promote, demote, make any decision substantially changing the salary or benefits of, or substantially reassigning the duties of Kelly Seale. The only record evidence to the contrary is David Seale's conclusory testimony that Episcopo made recommendations of termination to the Sheriff, who usually followed those recommendations. As indicated in Point II.A. of this Decision and Order, a non-moving party may not rely on conclusory allegations to defeat a motion for summary judgment.

Also, Plaintiffs make much of the several references throughout the record that Episcopo was in Kelly Seale's chain of command or that he signed her time sheets, effecting her pay. To be sure, the only evidence in the record regarding Kelly Seale's pay is that Episcopo would occasionally receive her time records and would then sign them and pass them on to payroll and that on one occasion he did not timely pass along her time sheet to payroll. This incident, resulting in a one-time delay in Kelly Seale receiving a paycheck, does not rise to the level of a substantial change in salary. Moreover, the mere ability to direct or assign work does not amount to a "tangible employment action." *Wiercinski v. Mangia 57, Inc.*, — F. Supp. 2d —, —, 2014 WL 1672381, at *17 (E.D.N.Y. 2014) (citation omitted).

However, even assuming Episcopo was Kelly Seale's supervisor, the County has identified undisputed evidence that during the time of the events underlying this action, it had a sexual harassment policy in the workplace and provided a procedure by which employees could

complaint of such harassment. In addition, the record is clear that Kelly Seale was aware of the policy and procedures for making a complaint but that prior to November 5, 2009, she never complained to anyone at the County, including David Seale, about the harassment, which she claims began as early as May 2008. The record is also clear that Kelly Seale experienced no harassment from Episcopo after she complained to Bailey on November 5, 2009. As indicated in Part II.B.1. of this Decision and Order, where, as here, an employer maintains a policy against sexual harassment and provides a process through which employees can complain about violations of the policy; where, as here, the plaintiff employee fails to take advantage of that system until more than a year after the alleged harassment began;[9] and where, as here, the offensive conduct ceased once the plaintiff reported it, an employer will have established its affirmative defense to a claim of strict liability for the harassing behavior of its supervisor-employee.

Finally, given that Episcopo was Kelly Seale's co-worker, Defendants have identified undisputed record evidence that the County provided a reasonable avenue for complaint, of which Kelly Seale was aware, and that it did not learn of the harassment until November 5, 2009, after which time Kelly Seale admits, she experienced no further harassment by Episcopo.

---

[9] Plaintiffs' frequent unsupported assertions throughout its Response to Defendants' Statement of Material Facts that Kelly Seale did not timely report the harassment because she was afraid of retaliation fails to create a question of material fact for two reasons. First, in violation of this Court's Local Rules and caselaw, Plaintiffs fail to cite to any evidence in the record supporting this assertion. Second, Plaintiffs fail to cite any record evidence supporting the basis for Kelly Seale's asserted fear of retaliation. *See Leopold*, 239 F.3d at 246 ("A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.").

For these reasons, Defendants' motion for summary judgment on Kelly Seale's Title VII and NYHRL hostile work environment claims is granted.[10]

Second, Plaintiffs' Section 1983 claim of hostile work environment against Episcopo must be dismissed because the record contains undisputed evidence that the alleged incidents of harassment are not severe or pervasive as a matter of law.

Here, Kelly Seale identifies the following incidents in support of her hostile work environment claim: (1) in May 2008, Episcopo placed a radio, at a loud volume, outside of his office so that Plaintiff could not hear what was being said in his office, and later, after Kelly Seale complained, Episcopo removed the radio, telling Kelly Seale, "your radio privileges have been revoked," (2) in September 2008, Episcopo failed to timely pass Kelly Seale's timesheet to

---

[10]     As indicated in Part II.B.1. of this Decision and Order, this Court's ruling regarding Kelly Seale's Title VII claim applies with equal force to her tandem claim under the NYHRL.  Nonetheless the Court briefly addresses the parties' arguments that there is a different standard regarding employer liability the under the NYHRL.  To be sure, New York courts have held that "[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it."  *Doe v. State*, 89 A.D.3d 787, 933 N.Y.S.2d 688, 690 (2011)).  "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense."  *Div. of Human Rights v. St. Elizabeth's Hosp.*,  487 N.E.2d 268, 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411 (1985); *see also Selmanovic v. NYSE Grp., Inc.*, No. 06-CV-3046, 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007) (same).  Alternatively, an employer's "calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation." *Guzman v. Macy's Retail Holdings, Inc.*, No. 09-CV-4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010) (quoting *Melendez v. Int'l Serv. Sys., Inc.*, No. 97-CV-8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr. 6, 1999)).  Here, again, the record contains undisputed evidence that, once aware of Kelly Seale's allegations of harassment, it took action to investigate and prevent further harassment.  Moreover, the evidence is clear that no further harassment took place after the County learned of Kelly Seale's complaint.  Accordingly, on this alternative basis, Defendants' motion for summary judgment is granted regarding Kelly Seale's NYHRL hostile work environment claim against the County.

payroll, resulting in her paycheck being late, (3) in October 2008, Episcopo loudly stated from inside his office that "this department is made up of a bunch of fucking cry babies that can't do their jobs" and referenced others "milking comp and crying that their arms hurt," (4) on December 10, 2008, a pornographic snowman cartoon appeared on Kelly Seale's desk, (5) in July 2009, after Kelly Seale returned from vacation, Episcopo loudly sang "the bitch is back" song and stated "red rocket" from inside his office, (6) on November 2, 2009, Episcopo invited everyone in the office except Kelly Seale to help themselves to snacks in the break room, and (7) on November 4, 2009, Episcopo loudly stated from his office that he was happy Zophy lost the election and that he was going to get rid of "those Zophy supporters one by one."

As indicated in Part II.B.1. of this Decision and Order, in order to be considered actionable conduct for purposes of a hostile work environment claim based on sex, the treatment must be because of the plaintiff's membership in a protected class, such as unwelcome sexual advances, requests for sexual favors, or, as is relevant here, other conduct of a sexual nature. The only incidents of conduct here that comport with the definition of actionable conduct are the December 2008 snowman cartoon incident and the July 2009 "bitch is back" incident. The remaining asserted incidents of conduct, while seemingly offensive or rude, are not actionable because they are not predicated on Kelly Seale's sex. *See Matthews v. Corning Inc*., — F. Supp. 3d —, —, 2014 WL 7499457, at *14 (W.D.N.Y. 2014) (failure to connect any gender based comment to other allegations of unfair treatment and crass and offensive remarks that are not predicated on plaintiff's protected class are not actionable) (citations omitted).

Regarding the actionable conduct, the Court notes that there is a lack of record evidence that it was Episcopo who placed the pornographic snowman cartoon on Kelly Seale's desk. Kelly Seale testified that anyone who had access to the hallway where her work station was

located could have placed the cartoon on her desk and she has no firsthand knowledge that it was Episcopo who did so. David Seale's testimony that, several years prior to December 2008, he and others received the exact same snowman cartoon from Episcopo via email, does not constitute evidence upon which a reasonable jury could conclude that Episcopo placed the cartoon on Kelly Seale's desk in December 2008.

However, even assuming there was evidence that it was Episcopo who placed the cartoon on Kelly's desk, that incident, coupled with the July 2009 "bitch is back"/"red rocket"[11] incident, do not rise to the requisite severe or pervasive conduct to prevail on a hostile work environment claim. *See, e.g., Monclova v. City of New York*, No. 12-CV-3187, 2014 WL 4828813, at *11 (E.D.N.Y. Sept. 29, 2014) (citing *Godineaux v. Laguardia Airport Marriott Hotel*, 460 F. Supp. 2d 413, 422-23 (E.D.N.Y. 2006) (holding that defendant's sexual comment and gestures in front of plaintiff, defendant's promise that defendant would "give Plaintiff stock tips if Plaintiff would sleep with him," and defendant's attempt to kiss plaintiff "did not rise to the level" of a hostile work environment); *DeSimone v. JP Morgan/Chase Bank*, No. 02-CV-7039, 2004 WL 2978011, at *6 (S.D.N.Y. Dec. 22, 2004) (granting defendant's motion for summary judgment on plaintiff's hostile work environment claim where, over a six-week period, plaintiff's supervisor "asked her out for drinks and dinner repeatedly, despite being rejected each time," "leered and stared at [plaintiff's] body during their encounters in the office," and made derogatory comments about other female employees); *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-CV-4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2002) (holding that defendants' actions were not

___

[11] To be sure, the phrase, "red rocket" alone is insufficiently actionable, given that Kelly Seale testified that, as of July 2009, she did not understand its origin, and that Episcopo and the deputy he was conversing with merely said "red rocket" without any further discussion of its context.

sufficiently severe to create a hostile work environment where plaintiff's supervisor called her a "bitch," complimented her hair and eyes, and told her she "looked good in tight pants")).

Moreover, the Court of Appeals for the Second Circuit has found far more inappropriate conduct not to be sufficiently severe or pervasive to create a hostile work environment. *See Monclova*, 2014 WL 4828813, at *11 (citing *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir.2012)). In *Cristofaro*, the Court of Appeals found that the record indicated "only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment" where over a seven year period, an employee's supervisor "occasionally commented on [plaintiff's] physical appearance," "participated in a bet with three other male employees as to whether [the supervisor] would be able to engage [plaintiff] in sexually explicit conversation," engaged "in conversation unrelated to work once a month for three-and-half years," and "briefly made contact with the side of [plaintiff's] body," among other actions. *See Cristofaro*, 473 F. App'x at 30 (citing *Alfano v. Costello*, 294 F.3d 365, 379-80 (2d Cir.2002)). Here, at best, Kelly Seale experienced two incidents of inappropriate sexual conduct in the workplace that occurred seven months apart, neither of which was physically threatening. Based on the totality of evidence, no reasonable jury could conclude that Kelly Seale was subjected to a hostile work environment. *See Alfano*, 294 F.3d at 378-80 (five incidents, spanning more than four years, including a graphic cartoon and several sexually humiliating events witnessed by others did not rise to the requisite level of severe or pervasive conduct for a reasonable jury to conclude that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule and insult") (citation omitted). For these reasons, Defendants' motion for summary judgment dismissing Kelly Seale's Section 1983 hostile work environment claim against Episcopo is granted.

## B. Kelly Seale's Retaliation Claims

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Kelly Seale's Title VII and First Amendment retaliation claims.

First, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's Title VII retaliation claim. Kelly Seale claims that Defendants retaliated against her for her complaint of sexual harassment against Episcopo by changing her office location and changing her vehicle assignment. Neither action is adverse for purposes of a Title VII retaliation claim.

To be sure, the Court denied Defendants' motion for judgment on the pleadings regarding this claim "in an abundance of caution" due to Kelly Seale's allegation that the change in office location resulted in a drastic change in the flexibility of her work schedule. *Seale*, 929 F. Supp. at 76-77. In support, the Court relied on *Lundy v. Town of Brighton*, 732 F. Supp. 2d 263, 276 (W.D.N.Y.2010) (citing *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658 (7th Cir. 2005)). In *Lundy*, the plaintiff police officer alleged that she was having mental health issues and needed to seek treatment, which prevented her from participating in a training schedule mandated by her employer. There, the court observed that "[t]hough a simple change in work schedule will not ordinarily rise to the level of a materially adverse action, when viewed in the context of the difficulties that plaintiff was experiencing at the time and the other surrounding circumstances, the schedule changes could reasonably be found to constitute adverse actions." *Lundy*, 732 F. Supp. 2d at 276. The Seventh Circuit Court of Appeals in *Washington*, relied on by the court in *Lundy*, found that a change in work schedule requiring the mother of a disabled child to arrive at work two hours earlier is materially adverse for her, even though it would not have been for 99 percent of the staff. *See Washington*, 420 F.3d at 662.

Here, after discovery, there are no facts in the record to support the conclusion that the change in Kelly Seale's office location was adverse to her. To the contrary, David Seale testified that, other than when one of their kids was sick, there was nothing that Kelly Seale needed to be doing at home or elsewhere during the hours of 9 a.m. and 3:30 p.m. (Dkt. No. 37-3 at 174:8-175:5.) Plaintiffs have failed to identify any record evidence of extenuating circumstances that would render Kelly Seale's change in office location, and consequent change in schedule flexibility, materially adverse.

Regarding Plaintiff's change in vehicle assignment, the record is devoid of facts upon which a reasonable jury could rely to conclude that such employment action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68, 126 S. Ct. at 2415. Here, Kelly Seale testified that the green van she was assigned to use, which she drove on only one occasion, was dirty, smelly, and that the brakes did not work well, requiring her to keep pumping them and to push the brake pedal all the way to the floor to get the vehicle to stop. Even assuming a jury were to credit this testimony, it does not rise to the level of adverse action required to prevail on a Title VII retaliation claim. The Court of Appeals for the Second Circuit, in an ADEA retaliation case applying the same standard as applied in Title VII cases pursuant to *Burlington Northern & Santa Fe Railway*, affirmed a lower court's holding that the plaintiff failed to assert an adverse employment action based on the denial or substantial delay of his ability to have necessary mechanical repairs and maintenance performed on his work vehicle. *See Witkowich v. Holder*, No. 05-CV-7756, 2010 WL 1328364, at *8 (S.D.N.Y. Mar. 21, 2010), *aff'd*, 424 F. App'x 20 (2d Cir. 2011).

In addition, the record contains no direct evidence that the decisions to change Kelly Seale's work location or to reassign her vehicle were motivated by retaliation for her complaint of sexual harassment. Rather, the only evidence of retaliatory motive is the temporal proximity between Kelly Seale's November 2009 complaint and her January 2010 office relocation and May 2010 vehicle reassignment. Even assuming that evidence is enough to establish causation, Defendants have met their burden to identify uncontroverted record evidence of legitimate, non-retaliatory reasons for the decision to relocate Kelly Seale's office and the decision to reassign her vehicle. The record shows that Kelly Seale's office was moved to the COB in order to reduce friction between her and Episcopo and that there were safety concerns motivating Riley's decision to reassign Kelly Seale, a civilian employee, to an unmarked vehicle.

For these reasons, Defendants' motion for summary judgment is granted regarding Kelly Seale's Title VII retaliation claim.

Second, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's First Amendment retaliation claim. Plaintiffs have failed to oppose Defendants' motion regarding this claim. As indicated in Part II.A. of this Decision and Order, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a modest burden. *See* N.D.N.Y. L.R. 7.1(b)(3).

Defendants argue both that the record fails to support Kelly Seale's assertion that her support of Zophy was a motivating factor in Defendants' retaliation or that she suffered an adverse action for purposes of a First Amendment retaliation claim. Defendants are correct.

Regarding causation, Kelly Seale testified that she was neutral regarding Zophy's candidacy and did not express support for his bid for County Sheriff. Accordingly, the record does not support Kelly Seale's claim that she engaged in constitutionally protected speech, which is the first element of her First Amendment retaliation claim.

Further, the record does not reflect any evidence that Kelly Seale suffered an adverse action that would warrant relief on this claim. As indicated above in Part II.B.3., in the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Zelnik*, 464 F.3d at 225. This standard is broader than the standard of what constitutes an adverse action on a gender discrimination claim, but is similar to the standard for the same element of a Title VII retaliation claim, which is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *White*, 548 U.S. at 68, 126 S. Ct. at 2415). "The list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying." *Wrobel v. Cnty. of Erie.*, 692 F.3d 22, 30 (2d Cir. 2012) (citation omitted). Here, the record is devoid of any factual basis for Kelly Seale's assertion that she suffered adverse action warranting relief on her First Amendment retaliation claim for the same reasons that such assertion fails regarding her Title VII retaliation claim, as previously articulated.

For these reasons, Defendants' motion for summary judgment is granted regarding Kelly Seale's retaliation claims under both Title VII and the First Amendment.

### C. David Seale's First Amendment Retaliation Claim

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on David Seale's First Amendment retaliation claim.

Defendants have met their burden to show the absence of a material issue of fact regarding David Seale's First Amendment retaliation claim. David Seale claims that Defendants engaged in several separate adverse actions in retaliation for his support of Zophy in the 2009 election for County Sheriff. For the following reasons, these alleged adverse actions are not actionable grounds to support David Seale's First Amendment retaliation claim and/or the record is devoid of facts upon which a reasonable juror could find that Defendants' actions were motivated by the protected speech.

First, David Seale contends that he was retaliated against for his support of Zophy in when, in 2008, he received a written counseling, at the direction of Episcopo, for his use of sick days in conjunction with his pass days. Also, David Seale contends that one of the tires on his patrol car was slashed by Episcopo in July 2008 in retaliation for his support of Zophy. "[I]t is obvious that protected activity must precede any purported retaliation to [establish] a First Amendment retaliation claim." *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 542 (S.D.N.Y. Feb. 25, 2014) (citing *Parkash v. Town of Se.*, No. 10-CV-8098, 2011 WL 5142669, at *7 (S.D.N.Y. Sept. 30, 2011), *aff'd*, 468 F. App'x 80 (2d Cir.2012)). Here, David Seale publicly supported Zophy in the Fall of 2009. Accordingly, no reasonable jury could find that the 2008 incidents of alleged adverse actions were retaliatory.

Next, David Seale contends, for the first time in his memorandum of law in opposition to Defendants' motion for summary judgment, that Riley's failure to interview him for a sergeant position in January 2014 was motivated by David Seale's support of Zophy in the 2009 election.

The Court need not, and does not, consider a claim presented for the first time in an opposition to a summary judgment motion. *See Weber v. City of New York*, 973 F. Supp. 2d 227, 275, n.26 (E.D.N.Y. 2013) (citing *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010)). Nonetheless, even if the Court were to consider this new ground, David Seale's retaliation claim cannot survive on this basis because the record is devoid of any evidence, either direct or temporal, that Riley was motivated by retaliation and the evidence that has been submitted supports the conclusion that Riley would have offered the position to another candidate even in the absence of David Seale's support for Zophy.

In addition, David Seale's contention that his patrol vehicle was vandalized in various ways when he returned to active duty in May 2010 cannot form the basis for his retaliation claim because there is no admissible evidence that any of the Defendants were involved in any such vandalism. The record regarding the May 2010 vandalism includes David Seale's testimony that he has no information that Riley, Bailey or Aylward were involved and Episcopo's affidavit stating that he was not involved. David Seale's interrogatory response that he does not know who performed the acts of vandalism, but that they started to occur shortly after Kelly Seale filed her complaint against Episcopo when there had never been any such acts of vandalism before is not direct or circumstantial evidence that Episcopo was involved in the May 2010 vandalism, and even if it were evidence of his involvement, the assertion is that he engaged in the alleged adverse action in retaliation for Kelly Seale's complaint against him, not David Seale's support of Zophy.[12] For these reasons, the alleged May 2010 vandalism may not form the basis for

---

[12]    Despite the multiple references in Plaintiffs' opposition papers to retaliatory acts against David Seale that were motivated by Kelly Seale's harassment complaint against Episcopo, the Court has previously dismissed, as a matter of law, David Seale's retaliation claim on that basis. *See Seale*, 929 F. Supp. 3d at 78-79 (citing *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 131 S. Ct. 863, 870 (2011)) (dismissing David Seale's Title VII claims, including his claim for retaliation, based on lack of subject matter jurisdiction due to his failure to file a charge with the Equal Employment Opportunity Commission).

David Seale's First Amendment retaliation claim.

David Seale's contention that the December 2009 denial of reimbursement for physical therapy is retaliatory also fails as a basis for his First Amendment retaliation claim because the record does not contain any evidence that any of the Defendants were involved in that decision. In fact, Riley, Bailey, Episcopo and Aylward each averred or testified that they had no involvement in the denial of David Seale's physical therapy reimbursement. David Seale himself testified that it was PERMA who denied his request, not the County. David Seale's conslusory assertion, by interrogatory response, that in the past, Sheriff Cary would intervene on his behalf with PERMA to take care of the issues with the denial of payment for physical therapy, but that, once Riley became Sheriff, he would not take care of these issues, is not evidence that Riley denied the reimbursement in the first instance. Accordingly, the December 2009 denial of reimbursement for physical therapy by PERMA cannot form the basis of David Seale's retaliation claim against Defendants.

The remaining alleged acts of retaliation include the November 2009 denial of vacation buyback benefits by Bailey, the April 19, 2010 directive from Riley that, while out on worker's compensation and Section 207-c leave, David Seale must communicate to his supervisor when he planned to leave his residence during work hours, and the April 29, 2010 denial by Riley of David Seale's requested shift change. To be sure, David Seale returned to work the following month, avoiding any loss of buyback benefits, and each of the April 2010 actions were rescinded, with minimal or no harm to David Seale.

The Court of Appeals has held that actions which are *de minimus* in nature may not be considered adverse for purposes of a First Amendment retaliation claim. *See Zelnik*, 464 F.3d at 227-228 (finding that the denial of emeritus status for a professor is not an adverse action where

the benefits of such status carried little or no value and was merely honorific). Also, while a combination of seemingly minor incidents may form the basis of adverse action once they reach a "critical mass" and "create a working environment unreasonably inferior to what would be considered normal for that position," that is not the case here. *Cf. Shanks v. Vill. of Catskill Bd. of Trs.*, 653 F. Supp. 158, 166 (N.D.N.Y. 2009) (quoting *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)) (finding a workplace environment that included "a sustained, systematic course of verbal harassment, threats, ostracism and generally demeaning behavior in order to drive [plaintiff] out of the Company" as well as the assignment of menial tasks, harassment outside plaintiff's home with obscene gestures, verbal insults, threats and the honking of horns to be considered a critical mass of incidents that create an adverse action for purposes of a First Amendment retaliation claim). Here, David Seale suffered no loss of income or employment benefit and the effects of each decision lasted less than a month before it was rectified or reversed. On this record, no reasonable juror could conclude that a person of ordinary firmness would be deterred by this alleged conduct from exercising his right to free speech.

Moreover, the record is devoid of any direct evidence that any of the Defendants involved in these three alleged adverse actions were motivated by David Seale's support of Zophy in the 2009 election. While there is an indirect inference of retaliatory animus based on temporal proximity between David Seale's support of Zophy and the denial of his vacation buyback benefits, the April 2010 actions are too remote, especially given the lack of direct evidence of animus. The Supreme Court has observed that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the

temporal proximity must be very close." *Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508 (2001) (citing decisions that hold three and four month intervening periods te be too attenuated to support inference of causality).

Therefore, for the foregoing reasons, Defendants' motion for summary judgment on David Seale's First Amendment retaliation claim is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' letter motion to strike Plaintiffs' response to Defendants' Statement of Material Facts and to award Defendants attorney's fees for their preparation of the letter motion (Dkt. No. 43) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 34) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**. The Clerk of the Court is directed to enter judgment and close this case.

Dated: February 17, 2014
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge